1
2
3
4

Gregory F. Wesner, WSBA #30241
HERMAN JONES LLP
15113 Washington Ave NE
Bainbridge Island, WA 98110
(206) 819-0821

5
6
7

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WASHINGTON
### SPOKANE DIVISION

8
9
10
11
12
13
14
15
16
17
18

| | |
|---|---|
| CONNOR O'KEEFE, on behalf of himself and all others similarly situated, | ) ) ) ) Case Number |
| Plaintiff, | ) ) |
| v. | ) **CLASS ACTION** ) ) |
| FARMINGTON STATE BANK d/b/a MOONSTONE BANK, DELTEC BANK & TRUST COMPANY LIMITED, and JEAN CHALOPIN, | ) ) ) ) ) |
| Defendants. | ) ) ) |

19
20

## CLASS ACTION COMPLAINT

21
22
23
24
25
26
27

CLASS ACTION COMPLAINT – 1

1.      This Action is a Related Action to the multidistrict litigation *In re: FTX Cryptocurrency Exchange Collapse Litigation*, No. 1:23-md-3076 (S.D. Fla.) (the "FTX MDL"), pending in the United States District Court for the Southern District of Florida before the Honorable K. Michael Moore (the "Transferee Court"). A copy of the Transfer Order issued by the United States Judicial Panel on Multidistrict Litigation (the "Panel") in *In re: FTX Cryptocurrency Exchange Collapse Litigation*, MDL No. 3076, ECF No. 138 (J.P.M.L. June 5, 2023), is attached as **Exhibit** A. A Notice of Potential Tag-Along Action is being concurrently filed before the Panel in accordance with Rule 7.1(a) of the Panel's Rules of Procedure. This Related Action, which was originally filed in the Southern District of Florida, *O'Keeffe v. Sequoia Capital Operations, LLC, et al.*, No. 1:23-cv-20700 (S.D. Fla.) is being filed again before this Court in this District in order to address the arguments Defendants Farmington State Bank, doing business as Moonstone Bank ("Moonstone"), Deltec Bank and Trust Company Limited ("Deltec"), and Jean Chalopin ("Chalopin") raise regarding whether the Transferee Court has jurisdiction over them for these claims. The substantive allegations in both actions are the same and will be amended in a consolidated amended class action complaint currently due to be filed August 7, 2023, once transferred to the Transferee Court and consolidated into the FTX MDL.

2.      On November 11, 2022, the world learned what Defendants had long known. Sam Bankman-Fried ("SBF") was a fraud.

CLASS ACTION COMPLAINT – 2

&#9679; **SBF** &#9881;

man all the dumb shit I said

it's not true, not really

Yesterday, 9:47 PM

everyone goes around pretending that perception
reflects reality

it doesn't

some of this decade's greatest heroes will never be
known, and some of its most beloved people are
basically shams

Yesterday, 9:48 PM

3.     Through his cryptocurrency exchange, FTX, SBF preyed on naïve, young investors, persuading them to deposit hard-earned monies into accounts on the exchange, promising them the funds would be safe and garner returns other financial institutions could not provide.

4.     Both were lies. SBF was in fact running a Ponzi scheme, whereby he took in FTX customer funds, transferred those funds to entities he separately owned, and then spent the money on things of unmatched luxury, including a Formula One team, beachfront property in The Bahamas, expensive cars, and private jets. SBF swindled more than $8 billion from FTX customers in this way.

5.     Though FTX customers could not see that SBF was misappropriating their deposits on vice, vanity, and speculative personal investments, Defendants had full view. Through diligence on FTX and close ties with SBF, Defendants learned that FTX was operated as SBF's personal piggy bank, that as quickly as FTX customer funds flowed into FTX, they flowed back out to other entities SBF separately owned or controlled, and that FTX lacked the most basic internal controls,

CLASS ACTION COMPLAINT – 3

1  such that the enterprise was in fact a house of cards. But Defendants did not care.

2  They, too, had money to make in the scheme, and their interests aligned with SBF's.

3      6.     SBF's fraud relied on two objectives: first, to keep FTX customer funds

4  flowing into accounts on the exchange; second, to keep the fraud concealed from the

5  public eye. Defendants shared these objectives, as each Defendant benefited from

6  the steady, and increasing, flow of customer funds into FTX accounts. Various banks

7  ("Defendants"), where FTX held multiple accounts, benefited billion-dollar

8  increases in their low-cost deposit bases derived from FTX customer funds. Venture

9  capitalists ("VC"), who invested more than $2 billion in FTX, benefited from the

10  astronomical valuation that increasing deposits generated for FTX, upon which the

11  value of the VCs' stakes in the company astronomically grew. Fenwick & West and

12  accounting firms, meanwhile, benefited from the premium fees they could continue

13  to extract for services to FTX, paid for with FTX customer proceeds.

14      7.     With shared objectives and complementary motives, Defendants

15  conspired with FTX to perpetuate the fraud, and each committed critical overt acts

16  in furtherance of it. Defendants provided a suite of non-routine, high risk banking

17  services to FTX, when traditional financial institutions would not, including

18  accepting and/or transferring Class Members (defined herein) funds into accounts

19  that Defendants knew were held by entities that SBF separately owned; developing

20  proprietary blockchain software and other infrastructure necessary to SBF's looting

21  of Class Members funds; and helping to fence Class Member funds across the U.S.

22  border.

23      8.     SBF could not have perpetuated the fraud without this assistance from

24  Defendants. Plaintiff O'Keefe, on behalf of himself and all others similarly situated

25  ("Class Members"), seeks damages for Defendants' knowing and substantial

26  assistance in furtherance of SBF's fraud.

27

CLASS ACTION COMPLAINT – 4

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this is a class action for a sum exceeding $5,000,000.00 and diversity of citizenship exists between at least one Class Member and at least one of the Defendants.

10.     This Court has general personal jurisdiction over Defendants Moonstone, Deltec, and Chalopin because Defendant Moonstone's principal place of business is in this District, and Defendants Deltec and Chalopin are engaged in substantial and not isolated activity within this state, rendering Defendants Moonstone, Deltec, and Chalopin subject to the jurisdiction of the courts of this state, whether or not the claim arises from that activity. Upon transfer of this Related Action to the Transferee Court for consolidation into the FTX MDL, the Transferee Court will have personal jurisdiction over Defendants Moonstone, Deltec, and Chalopin because in enacting the multidistrict litigation statute, 28 U.S.C. § 1407, Congress "authoriz[ed] the federal courts to exercise nationwide personal jurisdiction….and "[t]ransfers under Section 1407 are simply not encumbered by considerations of in personam jurisdiction…." *In re Agent Orange Prod. Liab. Litig. MDL No. 381*, 818 F.2d 145, 163 (2d Cir. 1987). The Transferee Court further independently has personal jurisdiction over Defendants because the Court has jurisdiction over one or more of the co-conspirators of the civil conspiracy alleged herein, and because Defendants regularly conducted business in Washington and/or engaged in continuous and systematic activities within Washington, and committed tortious acts in the state of Washington, including aiding and abetting the fraud, and the other tortious acts, as alleged herein.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391, because Defendants Moonstone resides in this District. Venue is also proper in the Southern District of Florida before the Transferee Court pursuant to 28. U.S.C. § 1407,

CLASS ACTION COMPLAINT – 5

1    because the Panel ordered in its Transfer Order that all Related Actions be

2    transferred to the Transferee Court and consolidated into the FTX MDL for pretrial

3    purposes. Venue is further proper in the Southern District of Florida before the

4    Transferee Court pursuant to 28 U.S.C. § 1391 because the acts, practices, and

5    courses of business constituting the violations alleged in this Complaint occurred

6    within this District.

7                                  **PARTIES**

8         12.    Plaintiff Connor O'Keefe ("Plaintiff O'Keefe") is a resident of the State

9    of Mississippi. Plaintiff O'Keefe held funds in both U.S. dollars and

10   cryptocurrencies in a yield-bearing account ("YBA," further defined herein) and/or

11   other account on the FTX platform. On November 18, 2021, Plaintiff O'Keefe

12   deposited these funds by direct transfer of US dollars from his bank account to an

13   account he understood to be held by FTX. As further detailed herein, FTX promised

14   that his assets would be secure and would return yields of 5% to 8%. Later, Plaintiff

15   O'Keefe transferred cryptocurrencies into his FTX account from an account he held

16   at Coinbase Global, another cryptocurrency exchange. Plaintiff O'Keefe believed

17   that he had made safe investments. To be sure, he regularly monitored his

18   investments, as well as the media surrounding FTX. Because of the overt acts taken

19   by Defendants and described herein, Plaintiff O'Keefe was misled to believe that the

20   assets placed in his FTX account were safe, that FTX was a legitimate operation,

21   and that its founder, SBF, was a trustworthy entrepreneur. Plaintiff O'Keefe never

22   fully liquidated the funds in his FTX account. Plaintiff O'Keefe's funds are now

23   frozen in his FTX account, and he has been unable to withdraw those funds since the

24   FTX fraud collapsed.

25        13.    Defendant Deltec Bank and Trust Company Limited ("Deltec") is an

26   offshore bank licensed and operating in The Bahamas. Deltec is one of the few banks

27

CLASS ACTION COMPLAINT – 6

in the world that offers a full suite of digital asset services, including multi-currency banking, digital asset custody, trading, market making, lending and borrowing.

14.  Defendant Farmington State Bank d/b/a Moonstone Bank ("Moonstone") is a state-chartered bank and member of the Federal Reserve based in Farmington, Washington. Moonstone "serve[s] new customers in underserved industries, such as digital assets and hemp/cannabis businesses."

15.  Defendant Jean Chalopin is a banking executive domiciled in The Bahamas. During the relevant period, Mr. Chalopin served, and continues to serve, as the chairman of Defendant Deltec and the chairman and chief executive officer of Defendant Moonstone.

## FACTUAL ALLEGATIONS

### A. The Rise of FTX

16.  In May 2019, SBF and his co-founders, Gary Wang and Nishad Singh, launched FTX Trading Ltd. ("FTX Trading") and West Realm Shires Services Inc. d/b/a FTX US ("FTX US"), which, along with various subsidiaries, affiliates and related entities (collectively, "FTX"), operated the FTX platform, which FTX purported to be a centralized digital asset exchange aimed at "the mass market and first-time users" of cryptocurrencies.

17.  FTX based its domestic operations in Miami, Florida, where FTX US was headquartered and where, in early 2021, FTX purchased the naming rights to the Miami Heat's waterfront arena for more than $135 million, one of many sports venues on which FTX paid to have its name emblazoned and one of many extravagant purchases made with Class Members' funds.

18.  Beginning no later than early 2019, for FTX Trading, and no later than May 22, 2020, for FTX US, Class Members could open "yield-bearing accounts" ("YBAs") and/or other accounts, and deposit a wide assortment of cryptocurrencies,

as well fiat currency, including U.S. dollars, into the accounts ("Class Member funds") through the FTX website or through FTX's mobile app.

19.     FTX lured Class Members to make such deposits with promises of 8% annual percent yield on assets equivalent up to $10,000 USD and 5% annual percent yield on amounts between $10,000 USD and $100,000 USD, each of which compounded hourly upon a Class Member's deposit of funds. At no time did FTX register the YBAs pursuant to any federal or state securities law.

20.     By structuring the rates of returns in this way, FTX targeted nascent investors—*i.e.*, those under the age of 30 and/or new to trading, both inexperienced and unsophisticated—by tying higher rates of return to lower deposit amounts with "no fees and no minimum balances."

21.     Unlike a traditional brokerage, FTX took custody of Class Members' assets, which FTX promised to safeguard. In its terms of service, FTX represented to Class Members that "[a]ll cryptocurrency or dollars (or other supported currencies) that are held in your account are held by FTX.US for your benefit;" that "[t]itle to cryptocurrency represented in your FTX.US Account shall at all times remain with you and shall not transfer to FTX.US.;" and that "FTX.US does not represent or treat assets in your FTX.US Account as belonging to FTX.US." FTX Trading's terms of service similarly represented that no customer funds were "the property of, or shall be loaned to, FTX Trading," and that FTX Trading "does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading."

22.     FTX assured Class Members that their assets were safe and could be withdrawn at any time, claiming on its website that "FTX *does* back the principal generating the yield with its own funds and equity." SBF further promised, on Twitter in August 2021, "[FTX] will always allow withdrawals (except in cases of suspected money laundering/theft/etc.)."

CLASS ACTION COMPLAINT – 8

23.    FTX also promised to protect against the risk that any customer would engage in self-dealing on the exchange or otherwise try to manipulate the market. For example, FTX claimed to offer "wash trading protection," representing that it implemented "exchange controls that actively prevent a party trading with themselves." Additionally, FTX represented, in its terms of service, that "FTX.US does not permit self trades in order to manipulate markets, reported statistics, or cause liquidations."

24.    FTX also purported to protect against the risk that any customer would become overleveraged or undercollateralized on the platform. For this, FTX touted its "risk-engine," an automated monitoring system that required FTX customers to pledge additional collateral to their accounts as trades went bad and, if the customer failed to do so, liquidated that customer's assets. FTX detailed its auto-liquidating "risk engine" and other purported risk management procedures in a public proposal to the U.S. Commodity Futures Trading Commission ("CFTC"), in which FTX sought permission to trade non-intermediated margin products (*i.e.*, without any intermediary to hold customer funds):

> A participant's margin level is recalculated every 30 seconds as positions are marked to market, and if the collateral on deposit falls below maintenance margin level, FTX's automated system will begin to liquidate the portfolio. The automated system will liquidate 10 percent of a portfolio at a time by placing offsetting orders on the central limit order book. Once the liquidation process results in collateral on deposit that exceeds the margin requirement, the liquidation will stop. Because the liquidation is done automatically and positions are marked to market every 30 seconds, these liquidations can occur at any time, on a "24-7" basis.

25.    FTX claimed that this and other risk management procedures distinguished it from other cryptocurrency exchanges and ensured that Class Member funds were protected from losses by other users. For example, on May 11,

CLASS ACTION COMPLAINT – 9

2022, SBF tweeted that "the margin mode is safe and conservative: real time risk engines mean you neither have to preemptively liquidate days early, nor risk positions going underwater for days." The next day, SBF testified before the U.S. House of Representatives Committee on Agriculture that:

> In our risk model the collateral is held directly at the clearinghouses, the collateral for all the positions. There is CFTC oversight of that collateral, and it is guaranteed to be there to not be used for anything else, to be **segregated**, and that is a difference with traditional models. It provides an extra guarantee of the assets backing these positions. (emphasis added).

26.     At that hearing, in response to Chairwoman Jahana Hayes' concern that FTX's risk monitoring system "could create an opening for fraud and abuse, particularly towards new customers that are entering the digital asset market for the first time," SBF assured that in FTX's model, "there is a lot of capital which is held directly with CFTC oversight [and] **segregated** accounts for margin for the customers' positions, which also provides a capital backstop . . . ." (emphasis added).

27.     More generally, in television commercials, through interviews, on Twitter, and in other publications, FTX repeatedly peddled itself as "the safest and easiest way to buy and sell crypto," and SBF repeatedly promised that "our users' funds and safety come first." In highlighting FTX's purported safety, SBF and other FTX executives falsely represented that FTX was insured by the Federal Deposit Insurance Corporation ("FDIC")—including in a tweet by FTX US President Brett Harrison that "direct deposits from employers to FTX US are stored in individually FDIC-insured bank accounts in the users' names," and "stocks are held in FDIC-insured . . . accounts"—until the FDIC ordered that FTX cease and desist in a letter dated August 18, 2022.

28.     SBF's carefully curated public persona complemented FTX's veneer of safety and was critical to FTX's meteoric rise. SBF came to be "the best-known

CLASS ACTION COMPLAINT – 10

1   proponent of the 'effective altruism' social movement which believes in prioritizing

2   donations to projects that will have the largest impact on the most people." In touting

3   his commitment to the movement, SBF explained on YouTube and to journalists that

4   "I wanted to get rich, not because I like money but because I wanted to give that

5   money to charity," and that "I pretty quickly run out of really effective ways to make

6   yourself happier by spending money . . . . I don't want a yacht."

7        29.   But in truth, SBF *did* want a yacht, and he wanted Formula One teams,

8   BMWs, beachfront condos, and cocaine-fueled parties. And he got those things—

9   with Class Member funds. SBF's association with altruism and charity, and his

10   public denouncements of greed and excess, generated a false trustworthiness among

11   the public and provided necessary goodwill for FTX, each critical to hide his lavish

12   spending of Class Member funds. Defendants dutifully piled on in laundering SBF's

13   reputation to conceal the fraud.

14        30.   On the basis of these reassurances, along with other representations

15   described herein, FTX grew to become one of the largest cryptocurrency exchanges

16   in the world—at its peak, the exchange's trading volumes reached approximately

17   $21 billion *per day* and its valuation topped $32 billion within three years of its

18   founding.

19        31.   Defendants knew that FTX's public representations were false,

20   including by way of the omissions set forth in Paragraphs 44 below, and that FTX

21   made a number of material omissions in soliciting Class Members' deposits, further

22   detailed below. But Defendants remained silent and, worse, fueled SBF's fraud.

**B. The Mechanics of SBF's Fraudulent Scheme**

24        32.   The FTX fraud was straightforward and, though concealed from Class

25   Members, the fraud was readily apparent to those, like Defendants, with visibility

26   into FTX's operations.

27

CLASS ACTION COMPLAINT – 11

33.     With the promise of higher-than-average returns and leading-edge safeguards, and by way of FTX's material omissions further detailed herein, FTX lured Class Members to deposit U.S. dollars and crypto-based assets into YBAs on the FTX exchange.

34.     Contrary to FTX's representations to its customers that "FTX.US does not represent or treat assets in your FTX.US Account as belonging to FTX.US," and unlike many of its competitors, including Coinbase Global, the largest U.S.-based exchange, FTX did not segregate customer funds or designate them for the customer's benefit, instead commingling those funds in several "omnibus" accounts held by FTX, including accounts at Banks such as Defendants, the few banks willing to service FTX.

35.     From those omnibus account, at SBF's direction, Defendants transferred Class Member funds to and among his separately owned entities, through which SBF enriched himself, his friends, and his family members, with uncapped spending on illicit drugs, political donations, naming rights to sports arenas, concert sponsorships, luxury cars, private jets, and real estate across the globe.

36.     Frequently, SBF routed his fraudulent scheme through Alameda Research LLC ("Alameda"), a cryptocurrency hedge fund that he independently owned. SBF and Mr. Wang formed Alameda two years before launching FTX and split ownership of Alameda 90% and 10%, respectively. SBF led Alameda as CEO until October 2021, from which time he continued to control the company and maintained ultimate authority over its trading, borrowing/lending, and investment activity.

37.     Until his scheme collapsed, SBF, along with a number of his lieutenants, publicly maintained that Alameda and FTX were "wholly separate entitit[ies] . . . at arm's length," and, despite their overlapping ownership by SBF, the companies were kept "separate in terms of day-to-day operations" by way of "a

CLASS ACTION COMPLAINT – 12

1    Chinese wall . . . to ensure that [Alameda wouldn't get] any sort of special treatment

2    from FTX."

3        38.    Contrary to these representations, SBF operated FTX and Alameda as

4    a common enterprise. The two companies shared offices for some time, as well as

5    key personnel and other resources critical to the companies' operations.

6        39.    SBF routinely funneled Class Member funds through Alameda and/or

7    other entities that SBF separately owned using Defendants, sometimes as bogus

8    "related party transactions." For example, financial statements for FTX Trading,

9    now available to the public for the first time, disclose "a related party receivable"

10   valued at $1.2 billion (equivalent to 44% of the company's assets); a $362 million

11   "related party payable"; $250 million in payments (equivalent to 25% of the

12   company's revenues) to a related party for "software royalties;" and a series of

13   related party transactions described only as "currency management" activities. The

14   same financial statements identify that these transactions were for the benefit of

15   SBF, noting that the "primary shareholder [*i.e.*, SBF] is also the primary shareholder

16   of several related entities which do business with the company." Other times, SBF

17   misappropriated Class Member funds as "loans, including for example, a $1 billion

18   'loan' to himself; a $543 million 'loan' to Mr. Singh; and a $55 million 'loan' to

19   Ryan Salame, another FTX executive."

20       40.    More often, SBF looted Class Member funds directly, without the cover

21   of sham related party transactions or insider loans. For many years, SBF directed

22   that FTX customer funds be wired to bank accounts at Silvergate held by North

23   Dimension, a wholly owned subsidiary of Alameda. North Dimension was a fake

24   electronics retailer created by SBF to disguise its ties to FTX. North Dimension

25   shared an address with FTX US in Berkeley, California, and published a website

26   through which customers often "had trouble actually purchasing products" and was

27   "rife with misspellings and bizarre product prices," including "sale prices that were

CLASS ACTION COMPLAINT – 13

hundreds of dollars above a regular price." For example, North Dimension advertised a $410.00 "Ipad 11 'ich Cell Phone" for the sale price of $899.00:



Once wired to North Dimension's accounts, Class Member funds were commingled with Alameda's and misappropriated by SBF. SBF has admitted to looting Class Member funds in this way, explaining to reporters after the fraud was revealed that "people wired $8b to Alameda and . . . it was never delivered to FTX."

41.    SBF found diverse ends for which to misappropriate Class Members funds, including to pay for Alameda's leveraged trades and investments, which had grown riskier over time. Initially, Alameda primarily traded in high-risk arbitrage, purchasing cryptocurrencies on one exchange and quickly selling them on other exchanges for higher prices. Later, Alameda pivoted to "yield farming," investing in cryptocurrencies that paid interest-like returns. Alameda's entrée into yield farming was not without internal controversy—in early 2021, Caroline Ellison, Alameda's CEO, expressed concerns about the riskiness of Alameda's yield farming investment strategy to no avail. Ms. Ellison was correct to observe that Alameda's bets had grown dodgier. At the time, Sam Trabucco, another Alameda executive, tweeted that Alameda's investing strategies increasingly relied on "intuition" and other unconventional measures, including "Elon Musk's social media posts." Ms. Ellison has since pleaded guilty to misappropriating FTX customer assets to fund Alameda's risky bets and to cover Alameda's colossal losses.

CLASS ACTION COMPLAINT – 14

42.     SBF used Class Member funds to underwrite Alameda's risky operations in other ways. Though SBF publicly claimed that Alameda was a "regular user" of FTX, contrary to that representation, FTX exempted Alameda from the automated "risk engine" described in Paragraph 24, allowing Alameda to avoid liquidation under the monitoring system. Compounding FTX's—and, though they did not know it, Class Members'—exposure to Alameda, SBF allowed Alameda to maintain a negative balance in its FTX accounts and steadily increased Alameda's negative balance cap over time. With these exemptions—exemptions offered to no other customers on the exchange—FTX extended Alameda a *de facto* limitless line of credit, which Alameda used to invest $8 billion in risky startups and esoteric cryptocurrencies—highly illiquid investments purchased on credit from FTX, funded with Class Member assets.

43.     SBF also misappropriated Class Member funds to inflate the balance sheets of Alameda, which were largely backed by FTT, a cryptocurrency that FTX contrived from thin air and issued to Alameda at no cost. FTX represented that, as "the backbone of the FTX ecosystem," FTT was widely distributed, but contrary to that representation, most FTT tokens issued were held by FTX and/or Alameda. As of June 30, 2022, Alameda's largest assets were tied to FTT, including "unlocked FTT" totaling $3.66 billion, and "FTT collateral" totaling $2.16 billion. Using Class Member funds and to the benefit of Alameda, SBF manipulated the value of FTT by implementing a "rolling program of buying back and burning [FTT] tokens," a process which consumed a third of FTX's revenue. By artificially increasing the value of FTT in this way, SBF increased the value of collateral available to Alameda, with which SBF was able to borrow billions of dollars from third party lenders in furtherance of his fraudulent scheme.

44.     Upon information and belief, SBF also employed Alameda to funnel Class Member funds from FTX US to his other companies. Just days before FTX

CLASS ACTION COMPLAINT – 15

filed for bankruptcy protection, Alameda withdrew over $200 million from FTX US; Alameda then transferred $142.4 million of those funds to FTX Trading's international accounts, exhibiting, according to industry experts, that Alameda had been serving as a "bridge between FTX US and FTX [Trading]" for some time.

45.  At no time did FTX, or any of the Defendants, disclose the foregoing to Class Members, including that:

- SBF was siphoning Class Member funds to his friends and family members or for his own personal use;

- FTX was not segregating Class Member funds, instead commingling those funds in FTX's omnibus accounts and treating those funds as FTX's own;

- FTX directed that Class Member funds be wired directly into accounts held by Northern Dimension, a subsidiary of Alameda;

- FTX and Alameda were not, in fact, "wholly separate entities at arm's length," and were instead operated as a common enterprise;

- SBF was looting Class Member funds under the guise of non-arm's length "related party transactions" and "loans" often by way of Alameda;

- SBF routinely transferred Class Member funds out of accounts held by FTX to those held by Alameda;

- SBF was using Class Member funds to underwrite his speculative personal investments at Alameda;

- Alameda was exempt from the "risk engine" and other FTX protocols in place to prevent a user from becoming undercollateralized or overleveraged on the exchange;

- With the foregoing exemption, Alameda engaged in margin trading on the FTX platform, exposing Class Members to the risk of Alameda's loss;

- FTX used Class Member funds to manipulate the price of FTT, which was not "widely distributed," but instead concentrated in the hands of FTX and Alameda; and

- FTX did not have in place fundamental internal controls, including an independent board of director or a CFO.

CLASS ACTION COMPLAINT – 16

46.    FTX and Defendants had a common interest in concealing these facts. Had Class Members known of these material omissions, they would not have deposited funds into accounts on the FTX exchange, SBF's fraud would not have succeeded, and neither SBF nor any of the Defendants would have stood to profit as handsomely as they expected. Defendants therefore worked to conceal the fraud, all the while inciting it with critical infrastructure, unique services, and dressings of legitimacy and security. For some time, Defendants succeeded. But, in late 2022, the fraud finally collapsed, and Defendants' misconduct was finally revealed.

**C. The Fraud's Collapse**

47.    Beginning in mid-2022, the value of cryptocurrencies rapidly declined, and SBF began to bail out troubled crypto firms that, if they were to fail, would bring down FTX with them and reveal SBF's fraud. For example, in the summer of 2022, FTX extended a $400 million revolving credit facility to BlockFi, a crypto lender. At the time, BlockFi held as collateral for loans hundreds of millions of dollars in FTT, the cryptocurrency that FTX had engineered to prop up Alameda. If BlockFi failed, the liquidation of those tokens would crash FTT, and in turn, Alameda, whose assets were primarily backed by the token. FTX's $400 million loan kept BlockFi afloat, and FTX engaged in a number of similar transactions, propping up failing crypto companies in order to keep the fraud alive, as 2022 progressed.

48.    Despite SBF's attempts to keep troubled crypto firms afloat, the value of digital currencies continued to decline throughout 2022, and FTX's liquidity crunch tightened. By the end of summer 2022, SBF needed another $1 billion to keep his fraudulent scheme running. He looked to Silicon Valley and to sovereign wealth funds in the Middle East, but he was unable to successfully solicit any further investments in FTX. Without this influx of capital, FTX's exposure to margin calls heightened and, in November 2022, SBF's house of cards finally collapsed.

CLASS ACTION COMPLAINT – 17

49.     On November 2, 2022, news broke that Alameda's balance sheet was propped up by the FTX-manipulated FTT, revealing the close ties between FTX and Alameda to the public for the first time. FTX had lent billions, including most of its FTT reserves, to Alameda, first as capital for trading, and eventually to cover Alameda's massive losses.

50.     Days later, on November 6, 2022, Changpeng Zhao, CEO of Binance, the world's largest cryptocurrency exchange and FTX's most powerful competitor, tweeted that he intended to sell Binance's $580 million holding of FTT, which threatened to crash the price of FTX's token and, in turn, Alameda's balance sheet. Mr. Zhao's announcement triggered demand for $5 billion in customer withdrawals, which FTX promptly halted due to a lack of funds.

51.     Two days later, Binance offered to rescue FTX from flatlining. On November 8, 2022, Binance announced a non-binding deal to acquire the company. But, after a 24-hour diligence period, Binance backed out of the deal, denying a critical capital injection to SBF. Mr. Zhao explained his reasons for the about-face: "Sam, I'm sorry. We won't be able to continue this deal. Way too many issues. CZ." In truth, there were always too many issues—issues with the interconnectedness between Alameda and FTX, issues with FTX's total lack of internal controls, issues with SBF's looting of Class Member funds—issues of which Defendants were aware, but helped conceal in furtherance of the fraud.

52.     Facing an insurmountable liquidity crisis, on November 11, 2022, FTX filed for Chapter 11 bankruptcy protection, and SBF resigned. The bankruptcy court appointed John J. Ray III, a 40-year industry veteran who oversaw the liquidation of Enron, to replace SBF as CEO. Mr. Ray quickly uncovered fundamental deficiencies in basic accounting, corporate governance, and other controls by FTX. These deficiencies were so startling that Mr. Ray remarked he had never "seen such a

CLASS ACTION COMPLAINT – 18

complete failure of corporate controls and such a complete absence of trustworthy financial information as occurred here." Moreover, Mr. Ray uncovered that:

> *First*, customer assets from FTX.com were commingled with assets from the Alameda trading platform.

> *Second*, Alameda used client funds to engage in margin trading which exposed customer funds to massive losses.

> *Third*, the FTX Group went on a spending binge in late 2021 through 2022, during which approximately $5 billion was spent buying a myriad of businesses and investments, many of which may be worth only a fraction of what was paid for them.

> *Fourth*, loans and other payments were made to insiders in excess of $1 billion.

> *Fifth*, Alameda's business model as a market maker required deploying funds to various third party exchanges which were inherently unsafe, and further exacerbated by the limited protection offered in certain foreign jurisdictions.

53.     Defendants knew of FTX's deficient internal controls and its misappropriation of Class Member funds, often by way of Alameda and "loans" to insiders, as well as Alameda's margin trading and other risk-taking activity on the FTX platform long before Mr. Ray. Indeed, Defendants facilitated these very failures, but affirmatively concealed them from the public for their own financial gain.

54.     The losses sustained by SBF's victims are staggering. FTX stole more than $8 billion in Class Member funds, the bulk of which has now vanished. Many Class Members came of working age in the recession and, later, the COVID-19 pandemic, and as a result have spent their lives working long hours for low wages, often across multiple jobs or in the gig economy. Unlike Defendants, these Class Members do not have money to burn. They are not "crypto-bros." They are

CLASS ACTION COMPLAINT – 19

financially vulnerable, and SBF, with the help of his co-conspiring Defendants, exploited their vulnerability for tremendous financial gain. Now, while SBF rests comfortably at his parents' home in Palo Alto, flush with the resources to post $250 million bail, SBF's victims are left with nothing.

**D. Defendants' Roles in the Fraud**

55.     The FTX fraud was a towering house of cards, and one that SBF could not have built on his own. SBF needed Defendants' assistance to achieve fraud of this scale. Defendants happily enlisted, with each agreeing, at least impliedly, to undertake certain overt acts in furtherance of SBF's scheme, including by providing state-of-the-art infrastructure, capital injections, and necessary cover for the fraud.

**(1) Defendants**

### a. Defendants Deltec, Moonstone, and Chalopin

56.     Defendants Deltec, Moonstone, and Jean Chalopin primarily assisted SBF in trafficking Class Member funds across the U.S. border. Defendant Deltec, at Mr. Chalopin's direction, provided one-of-a-kind digital asset banking services to FTX and, upon information and belief, served as a primary vehicle through which SBF routed Class Member funds offshore, beyond the reach of U.S. regulators and law enforcement. Defendant Moonstone, also at the direction of Mr. Chalopin, provided complementary services, assisting SBF in funneling more than $50 million in Class Member funds to entities he separately owned through accounts at the bank.

57.     Mr. Chalopin is a veteran of the crypto industry. As the chief executive of Deltec, he spent years assisting the Bahamian government in "transform[ing] the country into a sandbox for digital asset startups." Through these efforts, Mr. Chalopin developed close ties to FTX. With FTX, Deltec co-hosted a crypto summit in The Bahamas, at which Mr. Chalopin touted that "Deltec has been a long-time friend of FTX, and it is our pleasure to support them." FTX, in turn, was a great friend of Deltec. In October 2021, Deltec's parent company, Deltec International

CLASS ACTION COMPLAINT – 20

1  Group, received a $50 million loan from Norton Hall Ltd., an entity controlled by

2  Ryan Salame, CEO of FTX's Bahamian outfit.

3      58.    From its longstanding, close ties with FTX, Deltec gained an awareness

4  of FTX's fraud. Nevertheless, Deltec, at Mr. Chalopin's direction, assisted FTX in

5  moving Class Member funds offshore. These funds included, upon information and

6  belief, not only Class Members' U.S. dollar deposits, but also Class Members'

7  cryptocurrencies, as Deltec is one of few banks that offer the services necessary to

8  do that, including banking and taking custody of cryptocurrencies, as well as trading,

9  lending & borrowing digital assets.

10      59.    When it collapsed, FTX and other entities under SBF's control held no

11  fewer than 17 accounts at Deltec in currencies of various kinds, and SBF funded

12  those accounts using accounts held, upon information and belief, at Defendants

13  Silvergate and Signature:

14



25      60.    Later, by way of his close ties with SBF, Mr. Chalopin sought funding

25  from FTX for his other bank, Defendant Moonstone. Janvier Chalopin, Moonstone's

27  chief digital officer and Mr. Chalopin's son, reports that they "pitched [Alameda

CLASS ACTION COMPLAINT – 21

Research] the whole roadmap" to invest in Moonstone, which he claimed would fill "the massive gap in banking in the U.S. for digital assets businesses." The Chalopins succeeded. In January 2022, Alameda invested $11.5 million in Moonstone—nearly double the bank's net worth at the time.

61.    Moonstone was not always flush with such large inflows of capital. Until recently, Moonstone was the 26th smallest of 4,800 banks in the United States with a single branch in Farmington, Washington, a town of only 150 residents. In 2010, the bank's president bragged that it did not offer credit cards and held more deposits than loans outstanding. That changed in 2020, when Mr. Chalopin purchased Moonstone, purportedly to support the "underserved cannabis industry," and now serves as its chairman and CEO.

62.    Upon Alameda's investment in Moonstone, Moonstone promptly applied, and was approved, to become a member of the Federal Reserve. With that, FTX gained access to a third point of entry to the US banking system, and FTX promptly took advantage of these services, depositing $50 million in Class Member funds across two accounts. At the time of the fraud's collapse, FTX was Moonstone's largest customer, and Moonstone, for its part, benefited tremendously from this *quid pro quo*. With FTX's accounts, Moonstone's deposits jumped to $71 million in the third quarter of 2020, a 600% increase from Moonstone's historical average. In pursuit of continued growth and unprecedent profits, Moonstone, at the direction of Mr. Chalopin, gladly took action in furtherance of SBF's fraud.

63.    Deltec and Moonstone provided these services despite their awareness of SBF's fraud. From their close ties with SBF by way of Mr. Chalopin, from working closely with FTX in proselytizing on behalf of the crypto industry, and from pitching Alameda "the whole roadmap" for investments, Deltec and Moonstone knew, for example, that Alameda was owned by SBF—separately from FTX—and that FTX was misappropriating Class Member funds by funneling them through

CLASS ACTION COMPLAINT – 22

accounts under SBF's control at Deltec and Moonstone. Nevertheless, Deltec and Moonstone took overt acts in furtherance of the FTX fraud, with Moonstone providing FTX access to the U.S. banking system, and effecting transfers of Class Member funds into accounts under SBF's control; and Deltec, in turn, helping SBF fence Class Member funds, including those held in accounts at Silvergate, Signature, and Moonstone, across the U.S. border and beyond the reach of U.S. law enforcement. SBF could not have perpetuated the fraud without these services.

## CLASS ACTION ALLEGATIONS

64.     Plaintiff O'Keefe brings this action on behalf of himself and, under Federal Rules of Civil Procedure 23(a) and (b)(3), as the representative of a Class defined as follows:

> All natural persons and entities who purchased, deposited and/or transacted Class Member funds in accounts on the FTX platform any time after May 1, 2019, through FTX's collapse on November 11, 2022, the date on which it filed for bankruptcy, and have been harmed by Defendants' conduct alleged herein.

65.     **Numerosity and Ascertainability**. Members of the Class are so numerous that joinder is impracticable. Plaintiff O'Keefe does not know the exact size of the Class but believes that there as many as 2.7 million class members in the United States alone. As such, a class action is superior to other methods of adjudication due to its capacity for efficiency and its preservation of judicial economy, more specifically. Membership in the class may be ascertained through records held by Class Members, for example, their own bank records, and/or records held by FTX.

66.     **Typicality**. Plaintiff O'Keefe's claims are typical of the claims of the members of the Class. Plaintiff O'Keefe and all members of the Class were damaged by the same wrongful conduct of Defendants.

CLASS ACTION COMPLAINT – 23

67.     Plaintiff O'Keefe will fairly and adequately protect and represent the interests of the Class. Plaintiff O'Keefe's interests are coincident with, and not antagonistic to, those of the Class. Accordingly, by proving his own claims, Plaintiff O'Keefe will prove other Class members' claims as well.

68.     **Adequacy of Representation.** Plaintiff O'Keefe is represented by counsel who are experienced and competent in the prosecution of complex securities litigation on behalf of investors, including suits against third party aider/abettors to financial fraud. Plaintiff O'Keefe and his counsel have the necessary financial resources to adequately and vigorously litigate this class action. Plaintiff O'Keefe can and will fairly and adequately represent the interests of the Class and have no interests that are adverse to, conflict with, or are antagonistic to the interests of the Class.

69.     **Commonality and Predominance.** There are questions of law and fact common to the Class that predominate over any questions of law or fact affecting the claims of individual Class Members, including, but not limited to:

- Whether FTX's YBA program was a fraudulent enterprise;
- Whether FTX used material misstatements of fact or omissions to induce Class Members to deposit funds into accounts on the FTX exchange.
- Whether FTX and/or SBF breached a fiduciary duty to Class Members.
- Whether FTX and/or SBF converted Class Member funds.
- Whether the respective Defendants knew about or possessed a general awareness of wrongdoing by FTX and/or SBF;
- Whether Defendants' respective actions substantially assisted the wrongdoing of FTX and/or SBF;
- Whether Defendants conspired with FTX and/or SBF;
- Whether Defendants took overt acts in furtherance of that conspiracy; and
- Whether the Class has been damaged by the alleged wrongful conduct of Defendants.

CLASS ACTION COMPLAINT – 24

70.     **Superiority.** A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable, as Class Members are dispersed across the United States. Moreover, the claims of many Class Members does not exceed the cost of litigating the claims individually, and individual suits would not be cost effective or economically viable as individual actions.

### <u>CAUSES OF ACTION</u>

### A. Count One: Civil Conspiracy (All Defendants)

71.     Plaintiff O'Keefe hereby incorporates the allegations in Paragraphs 1 through 70 as if fully set forth herein.

72.     There was an express or implied agreement between at least one of SBF and/or other agents of FTX and each of the Defendants to deceive Class Members, and to commit the wrongful conduct described herein, including FTX's fraud, breach of fiduciary duty to Class Members, and conversion of Class Members property.

73.     Through the course of their due diligence and ongoing monitoring, and in providing high-risk, non-routine banking services to FTX and its founder, SBF, Defendants acquired knowledge of FTX's omissions and untruthful conduct and misappropriation of Class Members' funds. Despite this knowledge, each Defendant stood to gain financially from FTX's misconduct, and each Defendant agreed, at least impliedly, to assist that unlawful conduct.

74.     Defendants agreed, at least impliedly, with SBF and/or one or more of his co-conspirators to commit the overt acts alleged herein, each in furtherance of SBF's fraud, breach of fiduciary duty, and conversion of Class Members' property, including:  (1) accepting deposits of Class Member funds into accounts held by Alameda or other entities that SBF separately owned, notwithstanding knowledge that the funds belonged to Class Members; (2) transferring Class Member funds from accounts held by FTX first into stopover accounts held by Alameda, and then to

CLASS ACTION COMPLAINT – 25

SBF, his friends, and his family members, often labeled as large hundred-million dollar "loans;" (3) providing FTX and its affiliates access to the U.S. banking system, a service that other U.S. banks refused to provide; and (3) supplying other infrastructure critical to SBF's fraud—and unique to Defendants—including the SEN and Signet proprietary platforms.

**B. Count Two: Common Law Aiding and Abetting Fraud (All Defendants)**

75.   Plaintiff O'Keefe hereby incorporates the allegations in Paragraphs 1 through 70 as if fully set forth herein.

76.   FTX, and its founder SBF, defrauded Class Members by, among other things, making the following material omissions in soliciting their deposits:

- FTX was not segregating Class Member funds, instead commingling those funds in FTX's omnibus accounts and treating those funds as FTX's own;
- SBF was siphoning Class Member funds to his friends and family members or for his own personal use;
- FTX and Alameda were not, in fact, "wholly separate entities at arm's length," and were instead operated as a common enterprise;
- FTX directed that Class Member funds be wired directly into accounts held by Northern Dimension, a subsidiary of Alameda;
- SBF was looting Class Member funds under the guise of non-arm's length "related party transactions" and "loans" often by way of Alameda;
- SBF routinely transferred Class Member funds out of accounts held by FTX to those held by Alameda;
- SBF was using Class Member funds to underwrite his speculative personal investments at Alameda;
- Alameda was exempt from the "risk engine" and other FTX protocols in place to prevent a user from becoming undercollateralized or overleveraged on the exchange;
- With the foregoing exemption, Alameda engaged in margin trading on the FTX platform, exposing Class Members to the risk of Alameda's loss;

CLASS ACTION COMPLAINT – 26

- FTX used Class Member funds to manipulate the price of FTT, which was not "widely distributed," but instead concentrated in the hands of FTX and Alameda; and

- FTX did not have in place fundamental internal controls, including an independent board of director or a CFO.

77.     Based on their knowledge of the financial industry, with a focus on serving crypto clients, and their understanding of FTX's operations obtained through diligence, ongoing monitoring and/or hands-on partnership, Defendants acquired knowledge of FTX's omissions and untruthful conduct and misappropriation of Class Member funds.

78.     Notwithstanding this knowledge, and by reason of the conduct described above, Defendants substantially aided, abetted, and/or participated with SBF and his co-conspirators in a fraudulent scheme against Class Members, including by the actions set forth above.

79.     Defendants' actions, in combination with the actions of SBF and his co-conspirators, are a proximate cause of actual damages to Class Members. As a result of this conduct, Defendants are jointly and severally liable for aiding and abetting his fraudulent scheme.

**C. Count Three: Common Law Aiding and Abetting Fiduciary Breach (All Defendants)**

80.     Plaintiff O'Keefe hereby incorporates the allegations in Paragraphs 1 through 70 as if fully set forth herein.

81.     FTX took custody of the Class Member funds. As alleged herein, FTX promised Class Members funds were safe in its hands, and that FTX customer funds were "held by FTX for [their] benefit." As a custodian of Class Member funds, and by virtue of the promises FTX made to safeguard their funds, FTX owed a fiduciary duty to Class Members, and FTX was obligated to discharge that duty in good faith,

CLASS ACTION COMPLAINT – 27

with the care that a fiduciary in a similar position would exercise and in a manner reasonably believed to be in the best financial interests of Class Members.

82.    Rather than safeguarding Class Member funds, FTX misappropriated their funds in breach of the fiduciary duty owed to Class Members. These breaches include, but are not limited to: (1) transferring funds belonging to Class Members to Alameda and other of SBF's separately owned entities; (2) transferring funds belonging to Class Members to SBF and his co-conspirators; (3) using funds belonging to Class Members to engage in self-dealing, including non-arms' length transactions among SBF's affiliated entities.

83.    Based on their knowledge of the financial industry, with a focus on serving crypto clients, and their understanding of FTX's operations obtained through diligence, ongoing monitoring and/or hands-on partnership, Defendants had Defendants acquired knowledge of FTX's fiduciary duty to Class Members and breaches thereof.

84.    Notwithstanding this knowledge, and by reason of the conduct described above, Defendants substantially aided, abetted, and/or participated with SBF and his co-conspirators in a fraudulent scheme against Class Members, including by the actions set forth above.

85.    Defendants' actions, in combination with the actions of SBF and his co-conspirators, are a proximate cause of actual damages to Class Members. As a result of this conduct, Defendants are jointly and severally liable for participating in the breach of FTX's fiduciary duty.

**D. Count Four: Aiding and Abetting Conversion (All Defendants)**

86.    Plaintiff O'Keefe hereby incorporates the allegations in Paragraphs 1 through 70 as if fully set forth herein.

87.    The funds deposited by Class Members into YBAs on the FTX exchange were personal property of Class Members. SBF and his co-conspirators

CLASS ACTION COMPLAINT – 28

1  wrongfully exercised dominion or control over such property, misappropriating

2  Class Member funds entrusted to FTX.

3      88.    Based on their knowledge of the financial industry, with a focus on

4  serving crypto clients, and their understanding of FTX's operations obtained through

5  diligence, ongoing monitoring and/or hands-on partnership, Defendants had

6  acquired knowledge of FTX's conversion of Class Member funds.

7      89.    Notwithstanding this knowledge, and by reason of the conduct

8  described above, Defendants substantially aided, abetted, and/or participated with

9  SBF and his co-conspirators in conversion of funds belonging to Class Members,

10  including by the actions set forth above.

11     90.    Defendants' actions, in combination with the actions of SBF and his

12  co-conspirators, are a proximate cause of actual damages to Class Members. As a

13  result of this conduct, Defendants are jointly and severally liable for participating in

14  the breach of FTX's conversion of Class Member funds.

15                          **JURY DEMAND**

16     91.    Plaintiff O'Keefe demands trial by jury on all issues so triable.

17                        **PRAYER FOR RELIEF**

18     WHEREFORE, on behalf of himself and those similarly situated, Plaintiff

19  O'Keefe prays for judgment in its favor and against Defendants for compensatory

20  damages, punitive damages, attorney's fees, and for all such other relief as this Court

21  deems fair and just.

22                              Respectfully submitted,

23                              */s/ Gregory F. Wesner*
                                Gregory F. Wesner, WSBA No. 30241
24                              HERMAN JONES LLP
25                              15113 Washington Ave NE
                                Bainbridge Island, WA 98110
26                              Tel.: (206) 819-0821
27                              gwesner@hermanjones.com

CLASS ACTION COMPLAINT – 29

James R. Swanson, La. Bar. No. 18455
*(Motion to Appear Pro Hac Vice to be Filed)*
Kerry J. Miller, La. Bar. No. 24562
*(Motion to Appear Pro Hac Vice to be Filed)*
Benjamin D. Reichard, La. Bar No. 31933
*(Motion to Appear Pro Hac Vice to be Filed)*
C. Hogan Paschal, La. Bar No. 38495
*(Motion to Appear Pro Hac Vice to be Filed)*
Monica Bergeron, La. Bar. No. 39124
*(Motion to Appear Pro Hac Vice to be Filed)*
FISHMAN HAYGOOD L.L.P.
201 St. Charles Avenue, 46th Floor
New Orleans, Louisiana 70170-4600
(504) 586-5252; (504) 586-5250 fax
jswanson@fishmanhaygood.com
kmiller@fishmanhaygood.com
breichard@fishmanhaygood.com
hpaschal@fishmanhaygood.com
mbergeron@fishmanhaygood.com

***Counsel to Plaintiff O'Keefe and the Putative Class***

CLASS ACTION COMPLAINT – 30

# Exhibit A

UNITED STATES JUDICIAL PANEL
on
MULTIDISTRICT LITIGATION

IN RE: FTX CRYPTOCURRENCY EXCHANGE
COLLAPSE LITIGATION                                    MDL No. 3076

TRANSFER ORDER

   **Before the Panel:**[*]  This litigation arises out of the collapse of the FTX cryptocurrency exchange in November 2022 and the subsequent bankruptcy of FTX Trading Ltd. and its U.S. affiliate FTX US (together, FTX).  Plaintiffs are FTX customers and investors seeking to recover their losses.  Defendants are individuals and entities that allegedly facilitated FTX's wrongful conduct.  This litigation currently consists of eight actions pending in two districts, as listed on Schedule A.  Since the filing of the motion, the Panel has been notified of eleven related actions in the Northern District of California, Southern District of Florida, District of New Jersey, and Southern District of New York.[1]  Plaintiffs in the consolidated *Garrison* and *Podalsky* actions move under 28 U.S.C. § 1407 to centralize this litigation in the Southern District of Florida.

   Responding plaintiffs' positions on centralization vary.  Plaintiffs in three actions support centralization in the Southern District of Florida, and plaintiff in one action supports centralization in the Northern District of California.  Plaintiffs in eleven actions oppose centralization or request exclusion of their actions from any MDL.  In particular, plaintiffs in two potential tag-along actions (*Rabbitte* and *Gershovich*) which bring claims solely against investment firms Sequoia Capital Operations, LLC, Paradigm Operations LP, and Thoma Bravo, LP, request exclusion of their actions.  Plaintiff in a potential tag-along action against Signature Bank (*Statistica Capital*) requests exclusion of that action.  And plaintiffs in two potential tag-along actions request exclusion of the *Bhatia, Magleby,* and *Keane* actions against the Silvergate Bank defendants.[2]  Most of the opposing plaintiffs propose the Northern District of California if the actions are centralized over their objections.  Opposing plaintiff in one action (*O'Keefe*) proposes the Southern District of Florida.

---

[*] One or more Panel members who could be members of the putative classes in this litigation have renounced their participation in the classes and have participated in this decision.

[1] These and any other related actions are potential tag-along actions.  *See* Panel Rules 1.1(h), 7.1 and 7.2.

[2] The Silvergate Bank defendants are Silvergate Bank, Silvergate Capital Corp., and Alan J. Lane.

-2-

Responding defendants' positions on centralization also vary considerably.[3] Sequoia. Paradigm, and Thoma Bravo support centralization and have no preference on the transferee district. Prager Metis and Armanino support centralization in the Southern District of Florida. The Celebrity Defendants oppose centralization.[4] The Silvergate Bank defendants oppose inclusion of any claims against them, and the FDIC opposes inclusion of the *Statistica Capital* action against Signature Bank.

In opposition to centralization, the various plaintiffs and defendants primarily argue that the actions lack sufficient common questions of fact and informal coordination provides a practicable alternative. We find these arguments unpersuasive. The actions undoubtedly involve several non-overlapping defendants and raise defendant-specific issues. But they all rest on the same core set of facts concerning the alleged fraud that led to FTX's collapse and, in particular, revolve around the conduct of FTX's Samuel Bankman-Fried, the relationship with another Bankman-Fried company known as Alameda Research, and Alameda's Caroline Ellison. Indeed, Bankman-Fried and Ellison are defendants in seven of the eight actions on the motion, and are central figures in all of the related actions before the Panel. Moreover, all actions on the motion allege that there was a conspiracy between Bankman-Fried and other alleged FTX insiders to make misrepresentations to consumers and investors to induce them to invest in FTX products and use the FTX exchange. This common factual core warrants centralization despite the involvement of a number of different defendants. *See, e.g., In re January 2021 Short Squeeze Trading Litig.*, MDL No. 2989, 2021 WL 1258399 (J.P.M.L. 2021) (centralizing actions "nam[ing] more than forty brokers, funds, and clearinghouses as defendants" where all actions involved common conduct concerning the Robinhood trading platform). Transfer under Section 1407 does not require a complete identity of common factual issues or parties as a prerequisite to transfer. and the presence of additional facts or differing legal theories is not significant where, as here, the actions still arise from a common factual core. *See In re Auto Body Shop Antitrust Litig.*, 37 F. Supp. 3d 1388, 1390-91 & n.5 (J.P.M.L. 2014).

We further find that informal coordination is not an adequate alternative to centralization. Although the actions in the Northern District of California are in the process of being organized into three tracks, there are still seven distinct groups of non-overlapping plaintiffs' counsel pursuing claims in this litigation, including potential tag-along actions, on behalf of putative global and nationwide classes. Additionally, dozens of defendants are involved, with little overlap in their counsel. The large number of plaintiffs' and defense counsel will pose serious obstacles to informal coordination. Inefficiencies also will arise from having to coordinate these unusually complex actions involving novel cryptocurrency issues with the related criminal case in the Southern District of New York and the bankruptcy case in the District of Delaware. Moreover, informal coordination does not address the possibility of inconsistent rulings on *Daubert* and class certification issues.

---

[3] The responding defendants are Prager Metis CPAs, LLC; Armanino LLP; Sequoia Capital Operations, LLC; Paradigm Operations LP; Thoma Bravo, LP; the Silvergate Bank defendants; and seven "Celebrity Defendants" – the Golden State Warriors, Thomas Brady. Gisele Bündchen, Lawrence David, Kevin O'Leary, David Ortiz, and William Trevor Lawrence. Additionally, the Federal Deposit Insurance Corporation responded as receiver for Signature Bank.

[4] The Golden State Warriors alternatively request the Northern District of California.

Case 1:23-cv-23044-KMM   Document 1   Entered on FLSD Docket 07/26/2023   Page 34 of 41
Case 2:23-ase-00213-TOC-07EC-Tolume-11  138edFDF2/06285/23age Pag34 ofage 4 of 6

-3-

Although the Signature Bank and Silvergate Bank defendants are named only in the potential tag-along actions – not in the actions on the motion – we received extensive briefing and oral argument on whether the MDL should include them.  Both plaintiffs and defendants in those actions oppose their inclusion in an MDL because Signature Bank was closed in March 2023 and is in FDIC receivership, and Silvergate Bank is in voluntary liquidation.  Additionally, at oral argument, movants conceded that centralization of these claims is not warranted given the closure-related issues unique to those entities.[5]  Based on this record, we do not intend to include the claims against Signature Bank and the Silvergate Bank defendants.[6]

On the basis of the papers filed and the hearing session held, we find that the actions on Schedule A involve common questions of fact, and centralization will serve the convenience of the parties and witnesses and promote the just and efficient conduct of this litigation.  These actions present common questions of fact concerning the collapse of the FTX cryptocurrency exchange in November 2022, which allegedly was caused by the conduct of FTX former principals Sam Bankman-Fried, Zixiao "Gary" Wang, and Nishad Singh, and financial improprieties with Alameda Research.   All actions allege that FTX executives fraudulently withheld or misrepresented information with respect to customer assets on the FTX platform and that the professional services firms and celebrity promoters who worked with FTX were complicit in or otherwise bear responsibility for the alleged fraud – for example, by concealing FTX's financial problems or promoting FTX products with knowledge or willful blindness of the alleged fraud.  The common factual questions include: (1) whether FTX executives and their representatives misled customers about FTX's practices for safeguarding customer funds; (2) whether FTX executives and their representatives misrepresented the financial condition of the FTX entities; (3) whether FTX and Alameda executives embezzled customer assets; (4) the existence and scope of a conspiracy; and (5) the nature of FTX products, such as Yield-Bearing Accounts and FTT tokens.  Centralization will eliminate duplicative discovery; prevent inconsistent pretrial rulings, especially with respect to class certification and *Daubert* motions; and conserve the resources of the parties, their counsel and the judiciary.

The Southern District of Florida is an appropriate transferee district for this litigation.  A significant part of FTX's conduct allegedly emanated from this district, where it had its U.S. headquarters before filing for bankruptcy.  This district also provides an easily accessible location for this nationwide litigation.  Judge K. Michael Moore, who presides over the actions on the motion in this district, is an experienced transferee judge, and we are confident he will steer this matter on a prudent and expeditious course.

---

[5] For example, plaintiffs in *Statistica Capital v. Signature Bank* are subject to an exhaustion of administrative remedies requirement under the Financial Institutions Reform, Recovery and Enforcement Act because of the FDIC receivership, and that action thus has been stayed.

[6] We intend to transfer the actions against Sequoia, Paradigm, and Thoma Bravo through the conditional transfer order process, based on the common factual core discussed above.  *See* Panel Rule 7.1(b).  Those actions do not present the same efficiency concerns as the actions involving banks in closure-related proceedings.

-4-

IT IS THEREFORE ORDERED that the actions listed on Schedule A and pending outside the Southern District of Florida are transferred to the Southern District of Florida and, with the consent of that court, assigned to the Honorable K. Michael Moore for coordinated or consolidated pretrial proceedings.

PANEL ON MULTIDISTRICT LITIGATION

_Karen K. Caldwell_

Karen K. Caldwell
Chair

| | |
|---|---|
| Nathaniel M. Gorton | Matthew F. Kennelly |
| David C. Norton | Roger T. Benitez |
| Dale A. Kimball | Madeline Cox Arleo |

IN RE: FTX CRYPTOCURRENCY EXCHANGE
COLLAPSE LITIGATION                                    MDL No. 3076

## SCHEDULE A

Northern District of California

LAM v. BANKMAN-FRIED, C.A. No. 3:22−07336
PIERCE v. BANKMAN-FRIED, ET AL., C.A. No. 3:22−07444
HAWKINS v. BANKMAN-FRIED, ET AL., C.A. No. 3:22−07620
JESSUP v. BANKMAN-FRIED, ET AL., C.A. No. 3:22−07666
PAPADAKIS v. BANKMAN-FRIED, ET AL., C.A. No. 3:23−00024

Southern District of Florida

GARRISON v. BANKMAN-FRIED, ET AL., C.A. No. 1:22−23753
PODALSKY, ET AL. v. BANKMAN-FRIED, ET AL., C.A. No. 1:22−23983
NORRIS, ET AL. v. BRADY, ET AL., C.A. No. 1:23−20439

JS 44 (Rev. 10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
CONNOR O'KEEFE, on behalf of himself and all others similarly situated

## DEFENDANTS
FARMINGTON STATE BANK d/b/a MOONSTONE BANK, DELTEC BANK & TRUST COMPANY LIMITED, Jean Chalopin

**(b)** County of Residence of First Listed Plaintiff   Jackson County
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Whitman County
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | |
|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | ☐ 3 Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 | U.S. Government Defendant | ☒ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | Product Liability | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & | ☐ 367 Health Care/ Pharmaceutical | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | Slander | Personal Injury Product Liability | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 340 Marine | Injury Product Liability | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | **LABOR** | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Management Relations | **SOCIAL SECURITY** |
| ☐ 196 Franchise | | | ☐ 740 Railway Labor Act | ☐ 850 Securities/Commodities/ Exchange |
| | | | ☐ 751 Family and Medical Leave Act | ☐ 861 HIA (1395ff) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 864 SSID Title XVI | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 865 RSI (405(g)) | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | **FEDERAL TAX SUITS** | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | ☐ 871 IRS—Third Party 26 USC 7609 | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
U.S.C. 1332(d)

Brief description of cause:

## VII. REQUESTED IN COMPLAINT:
☒ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:

JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*   JUDGE   K. MICHAEL MOORE   DOCKET NUMBER 1:23-md-03076-KMM

DATE   7/26/2023

SIGNATURE OF ATTORNEY OF RECORD   /s/ Gregory F. Wesner

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Washington

| | | |
|---|---|---|
| CONNOR O'KEEFE, on behalf of himself and all others similarly situated | ) ) ) ) | |
| _____ Plaintiff(s) | ) ) | |
| v. | ) ) | Civil Action No. |
| FARMINGTON STATE BANK d/b/a MOONSTONE BANK, DELTEC BANK & TRUST COMPANY LIMITED, JEAN CHALOPIN | ) ) ) ) | |
| _____ Defendant(s) | ) ) | |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  FARMINGTON STATE BANK d/b/a MOONSTONE BANK
103 North First Street
Farmington, WA 99128

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney. whose name and address are:

Gregory F. Wesner
HERMAN JONES LLP
15113 Washington Ave NE
Bainbridge Island, WA 98110

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____          _____
                                              *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Eastern District of Washington

| | |
|---|---|
| CONNOR O'KEEFE, on behalf of himself and all others similarly situated | ) ) ) ) |
| *Plaintiff(s)* | ) |
| v. | ) ) Civil Action No. |
| FARMINGTON STATE BANK d/b/a MOONSTONE BANK, DELTEC BANK & TRUST COMPANY LIMITED, JEAN CHALOPIN | ) ) ) ) |
| *Defendant(s)* | ) ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  DELTEC BANK & TRUST COMPANY LIMITED
Deltec House, Lyford Cay
Nassau, Bahamas

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Gregory F. Wesner
HERMAN JONES LLP
15113 Washington Ave NE
Bainbridge Island, WA 98110

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____          _____
                                                          *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Washington

| | |
|---|---|
| CONNOR O'KEEFE, on behalf of himself and all others similarly situated | )<br>)<br>)<br>)<br>) |
| _Plaintiff(s)_ | ) |
| v. | )<br>) |
| FARMINGTON STATE BANK d/b/a MOONSTONE BANK, DELTEC BANK & TRUST COMPANY LIMITED, JEAN CHALOPIN | )<br>)<br>)<br>) |
| _Defendant(s)_ | )<br>) |

Civil Action No.

## SUMMONS IN A CIVIL ACTION

To: _(Defendant's name and address)_   JEAN CHALOPIN
Deltec Houst, Lyford Cay
Nassau, Bahamas

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Gregory F. Wesner
HERMAN JONES LLP
15113 Washington Ave NE
Bainbridge Island, WA 98110

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

_CLERK OF COURT_

Date: _____          _____
_Signature of Clerk or Deputy Clerk_

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
for the
Eastern District of Washington

| | |
|---|---|
| CONNOR O'KEEFE, on behalf of himself and all others similarly situated | ) ) ) ) ) |
| *Plaintiff(s)* | ) |
| v. | ) ) |
| FARMINGTON STATE BANK d/b/a MOONSTONE BANK, DELTEC BANK & TRUST COMPANY LIMITED, JEAN CHALOPIN | ) ) ) ) |
| *Defendant(s)* | ) ) |

Civil Action No.   2:23-cv-00213-TOR

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   FARMINGTON STATE BANK d/b/a MOONSTONE BANK
103 North First Street
Farmington, WA 99128

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Gregory F. Wesner
HERMAN JONES LLP
15113 Washington Ave NE
Bainbridge Island, WA 98110

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

CLERK OF COURT

Date: Jul 26, 2023, 4:38 pm

*Signature of Clerk or Deputy Clerk*